So we will dispense with the reading of the calendar and proceed to our first case, which I believe is Zeriant v. Auctus Fund, LLC. Thank you. Good morning, Marjorie Santelli for Appellant. So our client, Zeriant, brought this case seeking... Yell at me, Ms. Santelli. The Senate Chair is being kind. The instruction is speak up, because even with my hearing aids, this place is impossible. Okay, got it. So yell at me. All right. Our client brought an action seeking rescission of contracts under Section 29B of the Exchange Act. Section 29B provides the right to rescission. They call it voiding. The courts are usually calling it rescission at this point. For every contract made in violation of any of the provisions of this title or the performance which involves violation of this title. So two things to keep in mind when considering the contracts in this case is first, that these contracts are themselves securities contracts. Each contract or the contract as a whole affects transactions and securities. It affects the purchase and sale of a promissory note and a stock purchase warrant. The second thing to keep in mind is that under the motion to dismiss in this case, it was presumed that Octus was an unregistered securities dealer. They reached a decision. They didn't have to reach that aspect because of the analysis. So the claim was brought under, the violation alleged was under Section 15A of the Exchange Act. And under Section 15A, it's unlawful for any unregistered securities dealer to affect any transaction in any security. So if you have a contract that itself affects a transaction security. Does the contract obligate Octus to act as a broker or dealer? It doesn't, but it doesn't have to obligate the person to act as a broker or dealer. Has Octus sold any shares? Is there any indication that it will sell shares? In this case? In this case, yeah. No. So the- As a result of this contract, is there any indication? No. That it sold shares or that it will sell shares? I don't think at this time. So it's our position that the dealer status is established extraneous to the contract. All the factors that the SEC has established in their case, especially in the Al-Mugarabi case, they look at percentage of profits. They basically need to know if the person is in the business of buying and selling securities for its own account, but not as a trader. So there's going to be a threshold and some differences. There has to be enough profits. There has to be enough transactions. There's typically underwriting. Now what you're talking about is what the state of Massachusetts will have to prove in the SEC complaint that's pending in Massachusetts. But that's not what we're dealing here with. What we're dealing with here is under this contract, under the SPA, whether or not in its formation, which is an argument you now make on appeal, or its performance, there is a need to violate any of the SEC regulations or Section 15, as you point out. And so that's what we're dealing with here. You just said that extrinsic, whether they're a broker-dealer is extrinsic, but that's not what the law requires. The law requires that either the formation of the contract or its performance require a violation. And I don't see anything in either the performance or the contract that does. And you just conceded that the contract doesn't obligate them to act, opt us to act as a broker-dealer, or to sell any of the shares it acquires in payment of the debt that Zarian owns. Section 15A of the Act is violated when an unlicensed broker-dealer affects a transaction in securities. So if you've established that someone is an unregistered broker-dealer, all they need to do is buy a security, and they're prohibited from doing it. But that's unlawful, in order for contract rescission, you need the contract to require a violation. Someone can then do something illegal, but that doesn't make, that doesn't entitle you to rescission. But the purchase of the security, entering into the contract itself, or alternatively, looking at the only obligation of Optus under the SBA, was to buy a security, as an unregistered dealer, it was prohibited under the Act. When you're saying security, you're talking now about the loan, or you're talking about the warrants? Well, both. I mean, the contract itself, the SPA, when you, the SPA, the listed obligation. Under the existing loan agreement, did your client have the ability, or the ability under the terms of the agreement, to simply pay off the loan in cash? I assume so, they usually do. So how is this an agreement, then, that the performance of the agreement in that context would not have violated any SEC law, would it? Well, the only performance by Optus was to buy the security. Once they've done that, if you purchase the security, you've affected a transaction. In the note itself? Yes, the note itself. That's not an argument you made below, though, is it? No, well, I mean, it's stated somewhat. Well, I mean, the problem is, you go in front of Judge Kaplan, and you make an argument about what the illegal side of the contract is. And the illegal side of the contract in front of Judge Kaplan was about the warrants, and the exercises, and calling for the huge numbers of stock, and that that then significantly devalued. That's different than the argument now you're saying, which is just the taking of... You're saying now that just the taking of the note itself is a purchase of a security? Well, it is, yeah. I mean, so we're not the same counsel as below. So I'm a lender to a corporation, and I take a note. I'm now a broker? No, no. The question of whether or not you are a securities dealer is a broad analysis of your entire business. Because to be a dealer, there is a trader exception. They want to get someone who just buys and sells the securities as a trader. But if you get somebody whose entire business is buying and selling securities, it's not in the open market, they're acting like an underwriter, all the facts alleged in the SEC complaint, those are what make OCTIS... It's an interesting way to understand the agreement. So what you do is you go outside of the language of the agreement and look to how the participants to the agreement, or the offeror normally does their business. Is that it? Well, that is... Kind of more like what the Fifth Circuit's press or the Eleventh Circuit's press? Well, sort of, but, you know, that's... That's not a way to look at a contract, is it? Well, but you can have a contract like in Berkley v. Colquitt and some of the dicta in Mills. You can have fraudulent inducements so that the contract, in the making of the contract, there was a violation. That's closer to what happened here as brokers, since broker-dealers... I would find someone who bought, who was financing and acquired notes for the part of the financing, sold 30% of them and kept 70%. Are they a broker? So we're talking about a dealer, but I don't know. I mean, the question of what qualifies as a securities dealer under the Act was never argued or even brought up in the district court. The court assumed that, okay, if Octus is an unregistered dealer, even purchasing the note doesn't violate Section 15A. Okay. All right. Thank you. Thank you. You have reserved two minutes for rebuttal.  Good morning, Your Honors. Jonathan Sebald for the defendant, Apali, Octus Fund, LLC. May it please the court. I'd like to start where Your Honors left off, because I think you hit on a critical point here. There's a basic fundamental point that Xerion has brought a claim under Section 29B of the Exchange Act. It has not brought a claim under Section 15A. But in its briefing, and to an extent an oral argument today, Xerion has conflated the two. But as Xerion admits on page six of its opening brief, there is no implied private cause of action under Section 15A. And on that point, I wholeheartedly agree with Xerion. We cite on page 31 of our brief a number of cases saying there is no implied private right of action under Section 15. And so the question before this court today, as I think you all, Your Honors, have hit on, is whether Xerion has pled a claim under Section 29B of the Exchange Act, not whether it has pled a claim under Section 15A. And this distinction is critically important, because not every Section 15A violation triggers a 29B rescission claim. As this court explained just last year in Next Point versus ACES Capital Management, a case that Xerion does not cite in its briefing, Section 29B does not provide a pat legislative formula for solving every case in which a violation and a contract concur. Rather, it was a legislative direction to apply common law principles of a legal bargain. And so if every 15A violation allowed a private party to bring a cause of action under 29B, that would essentially create a, quote-unquote, backdoor private right of action under 15A, just like the one that this court warned against last year in Next Point. So while we disagree there is a 15A violation here, even assuming arguendo there was, that does not mean that Xerion has adequately pled a claim for 29B rescission. And that's, and your claim is because as we stated, this court stated in Next Point, only lawful contracts, unlawful contracts may be rescinded, not unlawful transactions made pursuant to lawful contracts. Is that what you're relying on in essence? Yes, precisely, Your Honor. I think that you're hitting on a critical point exactly right from Next Point. And in Next Point they said, if you look at the rescission statute there, which was under the Advisors Act, but which they said tracks 29B nearly word for word, that statute is centered on contracts, not the conduct of parties to the contract. And I would note, and I think Your Honor actually noted this, my friend across the aisle, when she was discussing the alleged violation here, she mentioned conduct extraneous. I believe she used the word extraneous to the contract. And that really exemplifies what we are saying here, that they have brought a case based on conduct extraneous to the contract, not based on the contract itself, which does not require any violation. And in Next Point, they noted their contract-centric reading was consistent with and harmony with a number of other appellate decisions in other circuits that have dealt with 29B rescission claims with respect to underlying registration violations. And those are Berkeley and regional properties and Edge Point. And those appellate decisions, they only permitted 29B rescission claims where the contract, where the violation was inseparable from, inherent in, or had a direct relationship to the contract. And they rejected rescission where the violation was tangential or collateral, or to use my friend's word, extraneous to the contract. I want to ask you a question about the status of our case law. So Next Point, which was a decision by this court, involved interpretation of, as the court there noted, nearly word for word, similar to 29B, of the Investment Advisors Act of 1940. And we have another Second Circuit case, the Oxford case from 2019, interpreting the Investment Company Act, again, of 1940, slightly different. But we don't have Second Circuit cases interpreting the same language, only Next Point by analogy. Am I correct? Yes. I mean, there are many district court cases within the Second Circuit on point, but no Second Circuit case. Is that correct? Yes, Your Honor. That's absolutely right. I think you've summarized the case law very well. And again, I would note, as you've pointed out, Your Honor, that Next Point does say that the Advisors Act section of that case tracks nearly word for word 29B. And they actually look at 29B case law in analyzing the status. Well, they rely on an SDNY case relating to section 29B. But your argument is really based on Next Point? Yes. By analogy. Yes, Your Honor. Next Point. And I would also note that Next Point, again, Next Point cited a number of appellate decisions in other circuits that they said are consistent with their decision. And those cases, like Berkeley versus Colquitt, Edge Point versus Apothecary, regional properties, all those cases dealt with section 29B. So I definitely agree with you, Your Honor, that Next Point was about the Advisors Act. But Next Point said all those 29B cases in other circuits were in accord with it. Are you still pursuing the timeliness argument? Yes, Your Honor. And I'm happy to... If so, why? I mean, it seems that there's an inconsistency in your argument. On the one hand, you're trying to apply the timeliness issue when the contract is formed. But I'm struggling with that. Sure. I'm happy to address that as well, Your Honor. And obviously, of course, Your Honor, that is a second basis on which we would ask this Court to affirm. The primary basis is the one on which this Court ruled on 29B. With respect to the statute of limitations argument, there's no dispute here that there's a one-year statute of limitations from when the plaintiff knew or with reasonable diligence should have known the facts underlying this claim. And there's no dispute that it was very easy at the time to look up Octus' broker-dealer registration status on the FINRA website. The only dispute here is whether plaintiff knew or with reasonable diligence should have known at the time of the contract that Octus engaged in other convertible lending activities that, in Zarian's view, would trigger a dealer violation. And on that point, I would point to Paragraph 29 of the complaint where Zarian admits that it's a— Is the argument that Zarian should have known that the contract was illegal when it was formed? Zarian either— No, Your Honor, I would say— Isn't that inconsistent, as Judge Kahn pointed out with your first argument, that there's nothing wrong with the contract? Well, I don't—I think it is that Zarian should have known the facts underlying a claim, underlying their theory. To the— If there was nothing wrong with the facts, as you suggest, then what would have triggered their knowledge that there was something wrong? I think you're right there, Your Honor. I think there is a bit of a tension there. To the extent that they say there was a 29B rescission claim at the time, then they should have been aware and exercised reasonable doubt. So your argument really is if the first argument fails, then the statute of limitations would kick in? Well, I think that's true. Yeah, I think we went on both on their own. But I think to an extent, yes, if the—I think Your Honor hit on something, and I agree with that. Anyway, I would just also note they—Zarian claimed in the reply brief that they didn't know any of the facts sufficient to bring a claim until the SEC filed its lawsuit. And Zarian's counsel has brought a number of identical 29B rescission claims across this country against many convertible lenders, none of whom were sued by the SEC. And so they had all the facts they needed to bring those claims without any SEC lawsuit. So the SEC—the claim that they couldn't file this lawsuit until the SEC filed the lawsuit is simply a red herring. And again, I would just point out that Zarian admits in its briefing that Maxim was its agent. And it says on paragraph 29 that Optus was actively making convertible loans through its agent—through Maxim at the time of the contract. So they had all the knowledge they needed, and obviously under black-letter law, Maxim's knowledge would be imputed to its principal, Zarian. I have 17 seconds left. I'm happy to answer any additional questions Your Honors may have. If not, thank you very much. Seeing none, thank you, counsel. Thank you very much. You have reserved your full two minutes for rebuttal, Attorney Centelli. Great. Thank you. I did want to begin by addressing this question of conduct extraneous to the contract. That happens to be exactly what conveys dealer status. Unlike a brokerage contract where there's evidence that the dealer is not a broker, that someone is being paid to act like a broker, and therefore in the business of buying and selling securities on behalf of another person, there's really no contract that is going to require an unregistered person to affect transactions and securities in his own account. So dealer status does happen separate from the contract. And so where the violation occurs is if you're an unregistered securities dealer, you violate the act by purchasing a security. So that's why we don't look at performance. Although you can examine the SPA that requires the purchase, that's their only obligation under the contract. I'd have to say that purchase to the contract and performance are kind of together here. They happen almost simultaneously. And secondly, that's why next point in any of these cases that deal with a brokerage contract and not a securities contract, you don't look at whether they violated the—it's not the performance. Is it correct that 10 district courts have rejected your position? They're about— So it's all in the Southern District of New York. There's other districts like in Arizona, one in Minnesota, I think New Jersey, that have come out completely differently. But the problem is that the first few cases alleged unlawful performance because of the potential to sell the securities after conversion. But those were downstream from the original contract. So no, that isn't going to be the violation here. But you have to realize that downstream sales can't occur unless there's been an upstream purchase. If it's not performance, which is all you argued before the district court, you're now arguing only formation and abandoning your performance argument? Well, performance, I wouldn't say it's abandoned, but the performance is specified in the SPA. Their only obligation was to purchase the security. And— Well, it's not an obligation. It's an option, right? If your client didn't pay the loan that it was advanced, over $5 million, and in exchange for that was supposed to pay $6 million, received two extensions, when it couldn't pay it, the option is that they could acquire stock of the company to pay back that debt. So it's not an obligation, is it? The obligation was if you purchase a convertible note, you've just purchased a security. The ability to convert— There's no question it's a security. If I purchase securities, that doesn't make me a broker-dealer, if I just purchase. Right. But the question here is did you effect a transaction in securities, not do you buy and sell securities. So any loan in which the borrower takes a note, is the borrower or is it the broker? No. So the security—like I said, the question of someone's—whether or not they're a securities dealer is based on a whole assessment of buying and selling securities for their own account. If you look at the securities—the SEC cases, they look at percentage of profits, where their primary business is, the quantity of securities, whether they're soliciting— So the answer is yes, depending upon other factors, extremes to the contract. Well, but purchasing a security is never going to be the determinant of—I mean, I guess if you do a lot of it, but purchasing a single security only comes under—in play under 15-8 if it's already established that you're a broker or a dealer. Okay. All right. Thank you. Thank you. Thank you to counsel. The court will reserve decision. Thank you, Your Honor.